# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Rose Dikeh,

           Petitioner,    Case No. 20-11166

v.    Judith E. Levy
United States District Judge

Rebecca Adducci, *et al.*,

    Mag. Judge Anthony P. Patti

           Respondents.

_____/

## ORDER DENYING PETITIONER'S MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDERING PERIODIC STATUS UPATES [2]

On May 8, 2020, Petitioner Rose Dikeh filed a Petition for Writ of Habeas Corpus. (ECF No. 1.) On May 11, 2020, Petitioner filed a Motion for Temporary Restraining Order, seeking immediate release from civil immigration detention at the Chippewa County Jail. (ECF No. 2.) Petitioner claimed that no conditions of confinement can ensure her reasonable safety due to her to risk of illness and death related to COVID-19. (*Id.* at PageID.37.) On June 2, 2020, the Court heard oral argument on Petitioner's motion through video/teleconference technology. On June

3, 2020, the Court denied Petitioner's motion without prejudice. (ECF No. 11.)

The Court ordered supplemental briefing on whether Petitioner is at increased risk of a dire outcome should she contract COVID-19. (*Id.* at PageID.119.) Petitioner filed a supplemental brief on June 15, 2020 (ECF No. 13), and Respondent filed a supplemental brief on June 17, 2020. (ECF No. 14.) Because the Court finds that Petitioner has not demonstrated a high likelihood of irreparable injury absent an injunction, the Court again denies her motion.

**I. Background**

Petitioner Rose Dikeh is fifty-four years old. (ECF No. 2, PageID.28.) She was admitted to the United States on an F-1 student visa in 2003. (ECF No. 1, PageID.3.) She has been in Immigration and Customs Enforcement custody since August 2019 and is currently detained at the Chippewa County Jail in Sault Ste Marie, Michigan. (*Id.*)

Petitioner has hypertension (*see id.*; ECF No. 13, PageID.134; ECF No. 14, PageID.148), which her medical records show is poorly controlled in detention. (ECF No. 13, PageID.140.) Although Petitioner alleges that her "uncontrolled hypertension has seemed to take a toll on her kidney

functions as well," (*id.* at PageID.135), the record does not include evidence by which the Court can find that Petitioner suffers from kidney disease or any other underlying health condition.

## II. Legal Standard

Temporary restraining orders "are extraordinary and drastic remedies [] never awarded as of right." *Am. Civil Liberties Union Fund v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015). In determining whether to grant such an order, courts evaluate four factors: 1) whether the movant has a strong likelihood of success on the merits; 2) whether the movant would suffer irreparable injury absent an injunction; 3) whether granting the injunction would cause substantial harm to others; and 4) whether the public interest would be served by granting the injunction. *Ne. Ohio Coal. for Homeless and Serv. Emps. Intern. Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). These four factors "are not prerequisites that must be met, but are interrelated considerations that must be balanced together. For example, the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer absent the stay." *Id.* (internal quotations omitted).

### III. Analysis

Although the Court employs a balancing test in determining whether a temporary restraining order is warranted, "the demonstration of some irreparable injury is a *sine qua non* for issuance of an injunction." *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 967 (6th Cir. 2002.) Because Petitioner has not demonstrated she would suffer irreparable injury absent an injunction, the Court must deny Petitioner's motion.

The Court has addressed the constitutionality of continued civil detention during the COVID-19 pandemic multiple times in other cases. In its most recent opinion on the issue, the Court set forth the analysis required to determine whether a noncitizen in civil detention has demonstrated a high likelihood of irreparable injury absent an injunction:

> In considering whether [a petitioner] who [is] still detained . . . similarly face[s] a high risk of irreparable injury, the Court must evaluate whether [the petitioner has] a heightened risk of a dire outcome from COVID-19. The Court must also evaluate the current severity of the COVID-19 pandemic and the conditions at the [petitioner's detention facility], including the extent to which any failure by [the detention facility] to implement precautionary measures increases the risk to [the petitioner]. Only by evaluating the totality of the circumstances can the Court properly assess the nature and degree of the risk to [the petitioner].

4

*Malam v. Adducci,* Case No. 20-10829 (E.D. Mich. June 28, 2020), ECF No. 127. Petitioner's hypertension places her at a heightened risk of a dire outcome from COVID-19. Additionally, precautions at the Chippewa County Jail fall short of meeting CDC guidance. However, the record does not include evidence by which the Court can conclude that the state of the COVID-19 pandemic in Chippewa County and at the Chippewa County Jail places Petitioner at a high risk of COVID-19 infection. Accordingly, the Court finds that Petitioner has not shown a high likelihood of irreparable injury and denies Petitioner's motion.

### A. Petitioner's Risk of Dire Outcome from COVID-19

The parties agree that Petitioner suffers from hypertension. (ECF No. 13, PageID.134; ECF No. 14, PageID.148.) However, the parties disagree as to whether Petitioner's hypertension increases her risk of dire outcome should she contract COVID-19.

Petitioner claims that "[u]ncontrolled blood pressure puts Ms. Dikeh at risk for severe illness or death should she contract COVID-19." (ECF No. 13, PageID.135.) Petitioner cites to statistics showing that hypertension is the most common comorbidity for those hospitalized from

5

COVID-19. (ECF No. 2, PageID.27–28.) Petitioner attaches to her supplemental brief the declaration of Dr. Rupa R. Patel, an infectious diseases specialist at Washington University in St. Louis and a member of the COVID-19 Infection Prevention Team at Barnes Jewish Hospital-Washington University in St. Louis. (ECF No. 13-1, PageID.138.) Dr. Patel, having reviewed Petitioner's medical records, writes that Petitioner "is a 54-year-old female . . . with poorly controlled hypertension . . . who has not had adequate access to medical care for several years prior to her arrival at [the Chippewa County Jail]." (*Id.* at PageID.140.) Dr. Patel notes that Petitioner's elevated blood pressure measurements "have been both on and off medications suggesting even with the introduction of amlodipine and lisinopril, her blood pressure is not under control despite using two different medications together." (*Id.* at PageID.141.) Finally, Dr. Patel concludes that "[h]aving continued uncontrolled blood pressure continues to put her at risk for very poor complications from COVID-19." (*Id.*)

Respondent argues that Dr. Patel's declaration does not explain the basis for his opinion regarding hypertension as a risk factor and does not describe the data or methodology used to reach his conclusion. (ECF No.

6

14, PageID.151.) "As such, his opinion does not meet reliability standards and is not admissible." (*Id.*) Respondent provides the declaration of Dr. John M. Flack, a Professor of Medicine and Chair of the Department of Internal Medicine at Southern Illinois University School of Medicine and Chief of the Hypertension Section and President of the American Hypertension Specialist Certification Program. (ECF No. 14-2, PageID.170.) Dr. Flack explains that "the studies that cite hypertension as a common comorbidity often do not adequately control for other comorbidities and their severity that are linked with hypertension and do not draw any conclusions on causality." (*Id.* at PageID.171.) Dr. Flack concludes that "[g]iven the prevalence of the condition, and that it increases with age, it is not possible to conclude from the data currently available that primary hypertension alone causes a more severe outcome from COVID-19 despite the fact that it is epidemiologically linked to this outcome." (*Id.* at PageID.174.)

The Court agrees with Respondent that Dr. Patel's declaration is conclusory and cannot independently support finding that hypertension is an independent risk factor. However, Dr. Patel's declaration is sufficient to show that Petitioner suffers from uncontrolled hypertension.

7

The Court's earlier analysis, in conjunction with three recent developments in the public health response to COVID-19, support a finding that hypertension increases the risk of a dire outcome from COVID-19. Accordingly, the Court finds that Petitioner is at increased risk of a dire outcome should she contract COVID-19.

In *Malam v. Adducci*, the Court reviewed the medical and public health evidence on hypertension as a COVID-19 risk factor and concluded that "the weight of the evidence demonstrates that Plaintiff hypertension . . . places [the petitioner] at substantially heightened risk of adverse outcome from COVID-19." Case No. 20-10829, 2020 WL 2616242, at *5 (E.D. Mich. May 23, 2020). Although Defendants in *Malam* raised the same argument regarding correlation and causation that Respondent raises here, the Court found that

> Developments in both CDC guidance and scientific publications nonetheless demonstrate that [a plaintiff with hypertension] is at substantial risk of severe illness and/or death from COVID-19. On April 16, 2020, the CDC amended its guidance on serious heart conditions, advising that "[p]eople with hypertension should continue to manage and control their blood pressure and take their medication as directed." Wayback Archive, Internet Archive (last accessed May 21, 2020), https://web.archive.org/web/20200416200039/https://www.cdc. gov/coron avirus/2019-ncov/need-extra-precautions/groups-at-

8

higher-risk.html (archiving April 16, 2020 snapshot of Information for People Who Are at Higher Risk for Severe Illness, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last reviewed Apr. 15, 2020)). [The Plaintiffs' medical expert] emphasizes that "[t]he CDC's guidance for groups at higher risk for severe illness specifically addresses individuals with hypertension." (ECF No. 82-8, PageID.2492.) At least one district court has found that these explicit references to high blood pressure and hypertension under CDC guidance for "[s]erious heart conditions" supports the finding that hypertension is a risk factor. See *Barbecho v. Decker*, No. 20-CV-2821, 2020 WL 2513468, at *3 (S.D.N.Y. May 15, 2020). Additionally, an April 23, 2020 CDC publication—issued after the American Journal of Hypertension article on which Defendants rely—both cites hypertension as a risk factor and notes that individuals with hypertension were six times more likely to die from COVID-19 than patients without any chronic health conditions. Mary Adams et al., *Population-Based Estimates of Chronic Conditions Affecting Risk for Complications from Coronavirus Disease, United States*, Emerging Infectious Diseases (Apr. 23, 2020), https://wwwnc.cdc.gov/eid/article/26/8/20-0679_article.

(*Id.*)

There are three additional important developments regarding hyptertension and COVID-19. First, the CDC has removed language casting doubt on a link between hypertension and adverse outcomes from COVID-19. Respondent cites to a CDC FAQ on COVID-19 and

9

Hypertension, which stated that "at this time, we do not think that people with high blood pressure and no other underlying health conditions are more likely than others to get severely ill from COVID-19." (ECF No. 14, PageID.149.) However, the CDC updated its guidance on June 17, 2020—the same day that Respondent filed her supplemental brief—and removed the FAQ to which Respondent cites. Wayback Archive, Internet Archive (last accessed June 29, 2020), https://web.archive.org/web/20200618143804/https://www.cdc.gov/coronavirus/2019-ncov/faq.html (archiving June 29, 2020 snapshot of Frequently Asked Questions, https://www.cdc.gov/coronavirus/2019-ncov/faq.html (last reviewed June 17, 2020)).

Second, the CDC now explicitly recognizes hypertension as a possible risk factor. On June 25, 2020, the CDC updated its guidance to state that "[h]aving other cardiovascular or cerebrovascular disease, such as hypertension (high blood pressure) or stroke, may increase your risk of severe illness from COVID-19." *People of Any Age with Underlying Medical Conditions*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra

10

precautions/people-with-medical-conditions.html#serious-heart-conditions (last reviewed June 25, 2020).

Third, the Secretary of the Department of Health and Human Services recognizes hypertension is a risk factor. In an interview on Sunday, May 17, 2020, Secretary Alex Azar stated that "if we have hypertension, if we have diabetes, we present with greater risk of severe complications from corona -- from this coronavirus." Kristen Holmes & Kevin Bohn, *Azar Lays Part of Blame for COVID-19 Death Toll on State of Americans' Health*, CNN (May 17, 2020), https://www.cnn.com/2020/05/17/politics/us-healthconditions-coronavirus-alex-azar-cnntv/index.html.

Accordingly, the Court reiterates its finding in *Malam*, consistent with the finding of many other district courts, that hypertension increases the likelihood of severe complications from COVID-19. *See United States v. Goin*, Case No. 11-20376, 2020 WL 3064452, at *5 (E.D. Mich. June 9, 2020); *United States v. Foreman*, No. 19-cr-62, 2020 WL 2315908, at *2–4 (D. Conn. May 11, 2020); *United States v. Soto,* No. 18--0086, 2020 WL 2104787, at *2 (D. Mass. May 1, 2020); *United States v. Sawicz,* No. 08-287, 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020).

11

Because of her poorly controlled hypertension, Petitioner faces a heightened risk of dire outcome should she contract COVID-19.

**B. Precautionary Measures at Chippewa County Jail**

Respondent argues that Petitioner is safe at the Chippewa County Jail because of a bevy of precautionary measures in place to reduce the risk of COVID-19 infection to detainees, inmates, and staff. (ECF No. 14, PageID.160.) However, the Court notes that the listed precautions fail to satisfy public health guidelines in several respects.

First, Respondent contends that "testing is conducted per CDC guidance." (*Id.*) On June 13, 2020, the CDC formally recommended testing of all persons in "settings that house vulnerable populations in close quarters for extended periods of time," including "correctional and detention facilities," in order to enable "early identification of asymptomatic individuals." Overview of Testing for SARS-CoV-2, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019ncov/hcp/testingoverview.html#asymptomatic_without_exposure (last updated June 13, 2020). The CDC further recommends "initial testing of everyone residing and/or working in the setting, [r]egular (e.g., weekly) testing of everyone residing and/or

12

working in the setting, and [t]esting of new entrants into the setting and/or those re-entering after a prolonged absence (e.g., one or more days)." *Id.* On May 15, 2020, Respondent explained that a total of zero COVID-19 tests had been performed on detainees at the Chippewa County Jail. (ECF No. 5, PageID.50.) Respondent's June 17 supplemental brief does not include any representations regarding the number of tests performed or showing that regular, universal testing is underway at the Chippewa County Jail. The declaration of Deportation Officer Lucas Wandyg only repeats the allegation that "[a]s of June 17, 2020, Chippewa County Jail has no confirmed or suspected cases of COVID-19." (ECF No. 14-4, PageID.250.) Unless and until the Chippewa County Jail tests all detainees, inmates, and staff, its COVID-19 response does not satisfy public health standards.

Second, social distancing remains difficult or impossible for detainees. Petitioner explains that she "and other detained individuals are kept together in one small room with a group of people who eat, live, and sleep in closely confined quarters." (ECF No. 2, PageID.29.) Additionally, "both food preparation and service are communal, with little opportunity for surface disinfection. Detainees eat all meals in a

13

communal area, where social distancing is impossible." (ECF No. 2, PageID.29.) Respondent contends that "Chippewa's population is a little over one-third of its capacity: it has capacity for 185 people but now houses only 72 people, 23 of which are ICE detainees." (ECF No. 5, PageID.53.) Respondent further explains that Petitioner "shares a cell meant for six people with one other person. . . . The cell has three bunk beds and access to a sink, shower, television, and phone. . . . There is a common area with a table and bench." Population reduction is important during a pandemic because a reduced population would allow detainees—even those who might be infected with COVID-19 but are asymptomatic—to remain six feet apart at all times. But whether the Chippewa County Jail has a detainee population of two or two hundred, it fails to meet public health standards if those detainees cannot socially distance themselves. And despite Respondent's efforts, Petitioner alleges that she is unable to practice proper social distancing.

Third, Petitioner alleges inconsistent use of personal protective equipment at the Chippewa County Jail. Petitioner writes that she "has rarely, if ever, observed Chippewa employees wearing gloves or masks, nor has she noticed the implementation of any additional cleaning

14

measures, and reported receiving little to no information about the pandemic." (ECF No. 2, PageID.29.) She also explains that detainees are required to use the same mask for an entire week. (ECF No. 6, PageID.95–96.) The CDC recommends that "[c]loth face coverings should be washed after each use." *How to Wash Cloth Face Coverings*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-to-wash-cloth-face-coverings.html (last updated May 22, 2020). Neither party alleges what kind of face covering is provided to detainees; the Court infers from CDC guidance that non-cloth face coverings should not be reused. To the extent that detainees are not regularly provided new masks and that jail staff do not wear masks at all, the jail's precautions fall short of a sound public health response.

### C. State of the Pandemic in Chippewa County

Although Petitioner is at heightened risk of a dire outcome from COVID-19 and precautions at the Chippewa County Jail are lacking in specific areas, Petitioner has not shown that the state of the pandemic in Chippewa County places her at a high risk of infection.

15

Petitioner primarily makes general claims about the state of the pandemic in the United States and among ICE detainees: "As of May 11, 2020, over 1,360,000 people in the United States have received confirmed diagnoses of COVID-19, and over 80,000 of those people have died" (ECF No. 2, PageID.27); "In the last week, since the filing of Plaintiff's Motion for Temporary Restraining Order, the confirmed cases in the state of Michigan has risen from over 45,000 to over 51,000" (ECF No. 6, PageID.93.); "ICE reported that as of May 9, 2020, only 2,045 detainees have been tested and 986 of those were positive. As of June 5, 2020, 5,096 detainees have been tested and 1,810 have tested positive." (ECF No. 13, PageID.134.)

While these statistics show a high general risk of COVID-19 infection, Petitioner must include allegations that allow the Court to infer that Petitioner faces a specific risk at the Chippewa County Jail. Petitioner's only argument to that effect is that "[g]iven that only 330 people in the county of Chippewa have been tested, out of a population of 37,349, new detainees cannot be certain that they have not been exposed to the virus." (ECF No. 6, PageID.95.)

16

As Respondent explains, Michigan's Upper Peninsula has experienced the COVID-19 pandemic differently from the Lower Peninsula. Respondent noted in her response on May 15, 2020 that " as of today, the 15 counties that comprise Michigan's Upper Peninsula have only 97 COVID-19 cases, with just over half of those cases (i.e., 51) in Marquette County, which is 162 miles from Chippewa County." (ECF No. 5, PageID.59.) As of June 30, 2020, there have been only 162 lab-confirmed cases of COVID-10 across the entirety of the Upper Peninsula. *Reported COVID-19 positive cases in Upper Michigan*, TV 6 (June 30, 2020), https://www.uppermichiganssource.com/content/news/List-of-reported-COVID-19-positive-cases-in-Upper-Michigan-569246041.html. The Chippewa County Health Department has now conducted 2,104 tests conducted, nine of which returned positive.[1] *Covid-19 Tracker*, Chippewa County Health Department, https://www.chippewahd.com/ (last updated June 30, 2020). Additionally, Respondents note that the Chippewa

---

[1] Of these nine cases, seven were reported on June 30, 2020. *Chippewa County Reports Seven New Cases of COVID-19*, SOO Today (June 30, 2020), https://www.sootoday.com/sault-michigan/chippewa-county-reports-seven-new-cases-of-covid-19-2530470.

County Jail has received only two new detainees in the past two months. (ECF No. 14, PageID.161.)

Without more, these statistics do not show that Petitioner is at high risk of infection from COVID-19 at the Chippewa County Jail. Accordingly, the Court cannot find that Petitioner faces a high likelihood of irreparable injury absent an injunction. The Court must deny Petitioner's motion. *Patio Enclosures, Inc.*, 39 F. App'x at 967.

The Court is nonetheless concerned about reports of seven new COVID-19 infections in Chippewa County and about Petitioner's allegations that precautions at the Chippewa County Jail do not satisfy public health guidelines. As Petitioner rightfully notes, so long as she is detained at the Chippewa County Jail, Petitioner

> is only as safe as those around her. If others choose not to be as cleanly, Ms. Dikeh is exposed to their uncleanliness. If an officer chooses not to change their gloves between searches of one detainee to another, Ms. Dikeh is exposed. If an officer overseeing the cohort of potentially sick detainees enters Ms. Dikeh's housing unit without having sanitized themselves, Ms. Dikeh is exposed.

(ECF No. 6, PageID. 97–98.)

Accordingly, the Court orders periodic status updates from the parties, to include the number of COVID-19 tests performed at the

18

Chippewa County Jail, the number of suspected and confirmed COVID-19 cases at the Chippewa County Jail, the number of detainees transferred into the Chippewa County Jail, and the number of COVID-19 cases in Chippewa County. Should Petitioner's circumstances change, she may renew her motion.

### IV. Conclusion

For the reasons stated above, the Court **DENIES** Petitioner's motion for a temporary restraining order (ECF No. 2) without prejudice. The parties are further **ORDERED** to provide a status update twenty-one days from the date of this order and every twenty-one days thereafter until this case is closed with the following information:

1. The number of detainees at the Chippewa County Jail tested for COVID-19;
2. the number of suspected and confirmed COVID-19 cases at the Chippewa County Jail;
3. the number of detainees transferred into the Chippewa County Jail; and
4. the number of COVID-19 cases in Chippewa County.

IT IS SO ORDERED.

Dated: July 1, 2020  s/Judith E. Levy
Ann Arbor, Michigan  JUDITH E. LEVY
 United States District Judge